UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BIG STIK MANUFACTURING, INC.,

    Plaintiff,

v.                                                                                         Case No: 8:17-cv-2486-T-36MAP

PITBULL TOOLS AND SUPPLIES LLC,
RICARDO CUYAR, ORLANDO AYALA
and R & K TOOLS AND SUPPLIES, LLC,

    Defendants.
_____/

## **ORDER**

This cause comes before the Court upon the claim construction briefs submitted by Plaintiff Big Stik Manufacturing, Inc. (Docs. 46, 50), and Defendants Pitbull Tools and Supplies, LLC, Ricardo Cuyar, Orlando Ayala, and R&K Tools and Supplies, LLC (Docs. 45,49). On October 17, 2018, the Court held a claim construction hearing (the "Hearing"). *See* Doc. 65. After reviewing the parties' submissions and hearing arguments of counsel, and otherwise being fully advised in the premises, the Court now construes the disputed claim terms.

    **I.    BACKGROUND**

On October 29, 2009, Plaintiff, Big Stik Manufacturing, Inc. ("Big Stik"), applied for U.S. Patent No. 8,434, 802 ("the '802 Patent"). The '802 Patent is an extension tool that involves two poles, one pole fitting inside the other one. The extension tool is used in the railroad industry to reach a wheel brake from the side of the tracks. The tool allows the user to adjust the brake without having to enter between the train cars.

Big Stik brings this patent infringement action against two of its competitors, Pitbull Tools and Supplies, LLC ("Pitbull") and R&K Tools and Supplies, LLC ("R&K") and their principals,

Ricardo Cuyar and Orlando Ayala (collectively, the "Defendants") for their alleged infringement of the '802 Patent.

Cuyar sought to design an improved telescoping extension tool for the railroad industry which would not easily jam or break, as did those existing in the market. To do so, Cuyar sought assistance from Glen Lofley, President of Big Stik. Lofley and his father invented an extension tool that jammed less often, that tool is the subject of the '802 Patent. Later, Cuyar created his own design that Plaintiff alleges infringes on the '802 Patent.

### a. Overview of the '802 Patent

Figure 1 of the '802 Patent shows an extension tool 10 that includes a first pole 50 and a second pole 100 positioned within an internal bore 52 of the first pole 50. Doc. 1-1 at 4 [Fig. 1], 23 [col. 6:58-7:6].



FIG. 1

The second pole 100 can slide within the internal bore 52 of the first pole 50 so the user can adjust the tool to different lengths. *Id*. The tool 10 also has a claw 200 secured to the second

pole 100, with which the user engages a wheel break and knuckle coupler of the railroad car. *See id*. at 4 [Fig. 1], 24 [col. 8:24-27]. As seen in Figure 3 of the '802 patent, the second pole 100 has a plurality of apertures 110. *See id.* at 4 [Fig. 3], 24 [col. 7:12-14].



FIG. 3

As seen in Figure 9 of the '802 patent, a pin lever 150 moves the pin 152 between a retracted position that allows the second pole 100 to extend, and a protruded position that locks the second pole 100 in place. *See id*. at 8, 24 [col. 7:14-18]. The pin lever 150 is between the first and second pin columns 184, 186, and is enclosed by a bridge member 190. *See id.* at 24 [col. 7:24-28]. When the user applies force to the handle plate 164 of the pin lever 150, the pin plate 162 engages a pin key 170 that encircles the pin 152. *See id*. [col. 7:48-55]. When the user releases the pin lever 150, a spring 158 pushes the pin 152 into a protruded position which allows the pin 152 to enter into one of the apertures 110 in the second pole 100. *See id*. [col. 7:40-45]. This mechanism allows the user to move the inner pole within the outer pole and lock it into place.



FIG. 9

### b. Prosecution History of the '802 Patent

On October 29, 2009, Plaintiff filed the '802 Patent application with the U.S. Patent and Trademark Office ("USPTO"), and included 37 claims, of which claims 1, 6, 16, 20, 25, and 34 were independent.[1] *See* Doc 45-2 at 151-172. On January 31, 2012, the USPTO issued a non-final Office Action which conveyed that claims 1-15, 20-24, 26-29, 31-33, and 37 were withdrawn from consideration; and the remaining claims 16-19, 25, 30 and 34-36 were rejected as being obvious in view of the prior art. *See id.* at 101-120.

On May 31, 2012, Plaintiff amended independent claim 16 and included features of Claim 17 (i.e., the pin lever includes a spring for biasing the pin into the protruded position). *See id.* at 84. It argued that claim 16 and the remaining pending claims would not have been obvious in view of the prior art. *Id.* at 63-77. It also added a new dependent claim 39 which recited "a first pin column and a second pin column positioned on opposing sides of the pin lever; a bridge member extending and coupled to said first pin column and said second pin column; and said bridge member having a bridge bore for receiving said pin." *Id.* at 100.

On August 14, 2012, the USPTO issued an Office Action which reiterated its rejection of claims 16, 18, 19, 25, 30, 34-36, and 38 as obvious over the prior art. *See id.* at 41-58. The Examiner rejected Plaintiff's argument that the prior art does not solve the same problem as the purported invention of the '802 Patent. *Id.* at 59. But the Examiner indicated that he would allow dependent claim 39; which included the first pin column, second pin column, bridge member and bridge bore features, if Plaintiff rewrote it in independent form. *See id.*

---

[1] Several claims were canceled during prosecution, so original claims 16 and 34 are the current Asserted Claims 1 and 14 in the '802 Patent. *See* Doc. 45 at page 9, n. 1.

On February 14, 2013, Plaintiff amended claim 16 (renumbered claim 1 in the '802 Patent) to add the first pin column, second pin column, bridge member, and bridge bore features of dependent claim 39. *See id.* at 14, 23. Plaintiff also amended claim 34 in a similar fashion (renumbered as claim 14 in the '802 Patent). *See id*. at 14, 38.

The Examiner then issued a Notice of Allowance allowing claims 10, 16, 18, and 25-38. *Id*. at 6. The Examiner allowed these claims because the prior art available did not teach or render obvious "a first pin column and a second pin column positioned on opposing sides of the pin lever; a bridge member extending and coupled to said first pin column and said second pin column; and said bridge member having a bridge bore for receiving said pin." *Id*. at 9.

On May 7, 2013, the USPTO granted the '802 Patent. Doc. 1-1 at 2.

### c. The Allegedly Infringing Products

In around 2016, Cuyar created his own design with Ayala, and the two formed Pitbull. Plaintiff contends that Pitbull's tool falls squarely within the '802 Patent because its differences are insubstantial. Doc. 46 at 3. Pitbull manufactures, uses, advertises for sale and sells devices called "brake stick tools" under the names "Brake Stick" and "Safety Stick" (collectively "Brake Stick"). Doc. 27 at ¶ 13. Pitbull advertises Brake Stick for use to "tie hand brakes off on rail cars" and to "open up knuckles" on rail cars so it can be coupled to another car. *Id*. at ¶ 16. Pitbull also advertises, offers to sell, and sells a device called the Mooring/Shipyard Safety Tool (the "Mooring Tool"). *Id*. at ¶ 19. The Mooring Tool has a two-sided claw slightly larger than the Brake Stick with a one-sided claw. Before forming Pitbull, Cuyar formed R&K. *Id*. at ¶ 25. R&K sold its brake stick tool in the United States under the name "SafStick." *Id*. at ¶ 27.

## II. LEGAL STANDARD

Claim construction is an issue of law reserved for the district court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). To ascertain the meaning of claims, the district court uses three primary sources constituting the intrinsic record: (1) the claims, (2) the specification and (3) the prosecution history. *Id.* at 979.

Claim construction begins with the language of the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). *See also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention.").

The words of a claim generally are given the ordinary and customary meaning they have to persons of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Vitronics*, 90 F.3d at 1582. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

And claim terms are presumed to be used consistently throughout the patent, so the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Phillips*, 415 F.3d at 1314-15; *Vitronics*, 90 F.3d at 1582. While the language of the claims is the first source for interpretation, "[t]he claims, of course, do not stand alone" *Phillips*, 415 F.3d at 1315. Rather, the claims are part of a "fully integrated written instrument" consisting of a specification. *Id*. For these reasons, "claims 'must be read in view of the specification, of which they are a part' " *Id*. (quoting *Markman*, 52 F.3d at 979).

The prosecution history is another component of the intrinsic evidence used to supply the proper context for claim construction. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). The prosecution history includes the complete record of the proceedings before the USPTO including prior art cited during examination. *Phillips*, 415 F.3d at 1317; *Vitronics*, 90 F.3d at 1582-83; *Markman*, 52 F.3d at 980. It also includes communications between the examiner and the applicant that may reveal if the applicant limited the invention during prosecution, with the effect of making the claim scope narrower than it would otherwise be. *Phillips*, 415 F.3d at 1317. The history can signify the inventor's understanding of the invention. *Id*.

Along with intrinsic evidence, courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history." *Markman*, 52 F.3d at 980. That evidence typically includes dictionaries, treatises and testimony of the inventor or experts. *Id.* Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and is appropriate only when the available intrinsic evidence is not dispositive. *Phillips*, 415 F.3d at 1317, 1319.

## III. DISCUSSION

### a. The Level of Ordinary Skill in the Art

Plaintiff contends that a person of ordinary skill in the art of designing and manufacturing extension tools for commercial and industrial use on October 29, 2009, would have at least five years of experience in designing and manufacturing mechanical tools and devices. Doc. 46 at 11. Defendant contends that a person of ordinary skill in the art of manufacturing extension tools, including those for use with railroad cars, would have at least an associate's degree in engineering or science or at least 2-4 years of experience designing or manufacturing extension tools or similar equipment, or both. For the purpose of construing the terms at issue, the Court has determined that a person of ordinary skill in the art of designing and manufacturing extension tools is a person with four years of experience designing or manufacturing extension tools or similar equipment as of October 29, 2009.

### b. The Disputed Claim Terms

Plaintiff alleges that the Brake Stick, Mooring Tool and SafStick all infringe on Claims 1 and 14 of the '802 Patent and argues that the tools copied the patented design to a "remarkable degree." *See, e.g.,* Doc. 46 at ¶ 17, 20, 28. Of the two, Claim 14 is the broader claim, as it relates to an "extension tool" generally as opposed to an "extension tool for engaging a railroad car" and does not include the "claw" element in Claim 1. *See* Doc. 46 at 7. And the claim terms in dispute in Claims 1 and 14 are the same, with one additional term in Claim 1 requiring construction. As a result, the Court will address the terms in Claim 14 first.

Claims 1 and 14 read as follows, with the disputed terms italicized.

> 1. An extension tool for engaging a railroad car, the railroad car including a front side, a rear side, a left side and a right side, the front side and the rear side including a knuckle coupler for linking with a second railroad car, the

front side and the rear side also including, a wheel brake for engaging a railroad brake, the extension tool, comprising:

> a first pole defining an interior bore, a first exterior surface and extending between a first end and a second end;
> a second pole defining a second exterior surface and extending between a first end and a second end;
> said first end of said second pole positioned within said second end of said first pole for positioning said second pole into said internal bore of said first pole;
> said second pole having a plurality of apertures defined in said second pole;
> a pin lever pivotal mounted relative to said exterior surface of said first pole;
> *a pin slidably engaging within said pin lever between a retracted position and a protruded position;*
> said pin lever released for positioning said pin into said protruded position and inserting said pin into said plurality of apertures of said second pole for terminating displacement of said first pole relative to said second pole;
> *said pin lever depressed for positioning said pin into said retracted position* and removing said pin from said plurality of apertures of said second pole for permitting displacement of said first pole relative to said second pole;
> said pin lever includes a spring for biasing said pin into said protruded position;
> a claw securing to said second end of said second pole for engaging either the knuckle coupler or the wheel brake of the railroad car;
> *a first pin column and a second pin column positioned on opposing sides of the pin lever;*
> *a bridge member extending and coupled to said first pin column and said second pin column; and*
> *said bridge member having a bridge bore for receiving said pin.*

14. An extension tool comprising:
> A first pole defining an interior bore with said first pole extending between a first end and a second end;
> A second pole extending between a first end and a second end;
> Said first end of said second pole located within said first pole for positioning said second pole into said internal bore of said first pole;
> Said second pole having a plurality of apertures defined in said second pole;
> A pin lever moving a pin between a retracted position and a protruded position;
> Said pin lever released for positioning said pin into said protruded position for inserting said pin into one of said plurality of apertures

> of said second pole for inhibiting displacement of said first pole relative to said second pole;
> *Said pin lever depressed for positioning said pin into said retracted position* for removing said pin from said plurality of apertures of said second pole for permitting displacement of said first pole relative to said second pole;
> *a first column and a second pin column positioned on opposing sides of the pin lever;*
> *a bridge member extending and coupled to said first pin column and said second pin column; and*
> *said bridge member having a bridge bore for receiving said pin.*

Doc. 1-1 at 26 [col. 11:15-54]; 29 [17:42-18:22].

Plaintiff asserts the following. Its proposed claim constructions follow the claim construction precedent from the Federal Circuit and do not seek to broaden or narrow the scope of the claims. Defendants have infringed independent claims 1 and 14. Claim 14 is the broader claim and related to an "extension tool" and not "extension tool for engaging a railroad car." It also does not include the "claw" element in Claim 1. Also, it argues that Cuyar attempted to "design around" the '802 Patent but fell short as the "insubstantial" changes from the original Lofley design still fall within the claims. Ultimately, it argues that Defendants' proposed constructions contradict the language of the claims and improperly read embodiments into the claims. Doc. 46 at 3.

Defendants argue that the Examiner twice rejected Plaintiff's Asserted Claims 1 and 14 before Plaintiff narrowed the claims by requiring the following structures: first and second pin columns, a bridge member extending and coupled to the first and second pin columns, and a bridge bore in the bridge member for receiving the pin. Doc. 45 at 6. They argue that despite narrowing its claims at the prosecution stage, Plaintiff is now trying to broaden the scope of its claims through claim construction to bolster its infringement argument. *Id*.

The Court finds that the following claim constructions follow the specifications in the '802 Patent under the case law.

### c. "said pin lever depressed for positioning said pin into said retracted position"

| Plaintiff's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|
| Plain and ordinary meaning of "depressed"- pushed down | "said pin lever engaged to position said pin into said retracted position" |

The Court agrees with Plaintiff that it should construe "depressed" according to its plain and ordinary meaning in the context of the use of the pin lever. Here, "depressed" means "pressed toward the pole." Because of the spring-loaded design, the handle plate 164 moves toward the pole 50 when pressed and pivots away from the pole 50 when released. Doc. 1-1 at 24 [col. 7:40-41, 44-45, 47-48], 8 [Fig. 10]. The "released" position keeps the pin protruded and locks the poles 50, 100, in place. The "pressed" position overcomes the tension of the spring and moves the pin 152 out of the aperture 110 allowing the inner pole 100 to slide within the outer pole 50. *Id*. at 24 [col. 7:61-64], 9 [Fig. 11]. But the term "pressed toward" is clearer than "depressed" because no matter how the user holds the tool (right-side up or upside down), the lever always moves toward the pole.

Accordingly, the Court independently will construe the term: "said pin lever pressed toward the pole for positioning said pin into said retracted position."

### d. "a first pin column and a second pin column positioned on opposing sides of the pin lever"

| Plaintiff's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|
| A first member and a second member positioned on opposing sides of the pin lever that secure the bridge | A first structure and a second structure, each raised perpendicularly with respect to the first pole, and located on opposite sides of the pin |

The parties ultimately came to an agreed construction: "a first member and a second member positioned on opposing sides of the pin lever, each member raised with respect to the first pole." The Court agrees with that construction and will adopt it accordingly.

### e. "a bridge member extending and coupled to said first pin column and said second pin column"

| Plaintiff's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|
| A structure or member extending and secured between the first pin column and the second pin column | A component, separate and distinct from the first pin column and second pin column, that spans across and is connected to the first pin column and the second pin column |

The parties dispute whether the bridge member must be integrally formed with the first and second pin columns, or whether the bridge member must be a separate and distinct component connected to the first and second pin column.

Plaintiff argues that the description of the first preferred embodiment supports its construction because it uses the term "secured between." Doc. 1-1 at 24 [col. 7:26-28]. It argues that Defendants attempt to add limitations from the drawings of various preferred embodiments. And, it argues, nowhere in the prosecution history or the specification does it state that the bridge member is "separate and distinct" from the pin columns. Doc. 46 at 17.

Defendants argue that their construction follows the plain language of the claim and the '802 Patent's specification. They argue that Plaintiff's construction would read the term "coupled to" out of the claim because the bridge member would not be "coupled to" itself. Thus, the term "coupled to" conveys that the bridge member must be a separate component connected to the pin columns. Doc. 45 at 15-16. The Court agrees. The description in the '802 patent specification describes the bridge member and the pin columns as separate components.

Accordingly, the Court adopts Defendants' construction and will construe the term: "a component, separate and distinct from the first pin column and second pin column, that spans across and is connected to the first pin column and the second pin column."

### f. "said bridge member having a bridge bore for receiving said pin"

| Plaintiff's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|
| Said bridge structure or member having a cutout or void space for accepting and aligning the pin with the apertures | The bridge member includes a through hole that extends through the bridge member, through which the pin extends through the bridge member |

The Court agrees with Plaintiff that it should give the term "bore" its plain and ordinary meaning. *See* Doc. 46 at 19. But the plain and ordinary meaning of a bore is a "hole"; not a "cutout or void space" as proposed by Plaintiff. The dictionary discloses a similar meaning. Webster's defines a "bore" as a "hole made by boring," or "a deep vertical hole; an interior cylindrical opening usu[ally] running the entire or nearly the entire length of an object." *See Bore*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (3rd ed. 2002).

Defendants argue that Plaintiff's definition improperly tries to broaden the claim scope. They argue that the '802 Patent does not disclose that the bridge bore functions to align the pin with the apertures. And although the pin passes through the bridge bore, thereby restricting the pin's movement, they argue that the '802 Patent explains that the collar bore 188 receives the pin 152 before it contacts the second pole 100 and the apertures within it. *See* Doc. 45 at 24.

The drawings and specifications show a hole through the plate. The cross-sectional drawings of the '820 Patent design best illustrate that this aspect of the invention was conceived as a hole, and not just a void space. A person skilled in the art would see the word "bore" in the '820 Patent and would understand it to mean a "hole" through the plate. Thus, the Court will construe the term "bore" consistent with its plain and ordinary meaning as demonstrated by the dictionary definitions. *See Phillip*, 415 F.3d at 1312 ("We have frequently stated that the words of a claim are generally given their ordinary and customary meaning.") (internal quotation marks omitted).

In essence, the bridge member 190 must have a hole in it to receive the pin 152 specifically to align with the apertures 110, regardless if the pin 152 extends through the bridge member 190 or merely enters the hole but does not extend all the way through. Thus, as Plaintiff argues, Defendants' proposed construction improperly limits the scope of this claim element to drawings in the specification, without the patentee's express intent to do so. Defendants' proposed construction violates the *Hill-Rom* construction rules because it assigns a narrow and specific definition to "bore." 755 F.3d at 1372 ("[E]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal quotation mark omitted). But Plaintiff's proposed plain and ordinary meaning of "bore" as a "cut out or void space" is not one understood by someone with the ordinary skill in the art.

Accordingly, the Court will independently construe the term: "said bridge member having a hole for receiving said pin."

### g. "a pin slidably engaging within said pin lever between a retracted position and a protruded position" (Claim 1)

| Plaintiff's Proposed Claim Construction | Defendants' Proposed Claim Construction |
|---|---|
| A pin that is engaged by the pin lever to slide the pin between a retracted position and a protruded position. | A pin that slides through said pin lever between a retracted position and a protruded position |

The parties' dispute over interpreting this claim term centers on the proper description of the relationship between the claimed pin and the claimed pin lever. Plaintiff argues that although the specification describes the pin as sliding, it need not go all the way through the pin lever. Defendants argue that because the claim term states that the pin slidably engages "within said pin lever," the claim requires that the pin slide all the way through the pin lever. *See* Doc. 49 at 7-8.

15

The Court agrees with Defendants that Plaintiff's proposed construction reads out the word "within." Because the "claims define the scope of the right to exclude, the claim construction inquiry, therefore begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). Thus, the Court rejects Plaintiff's proposed construction.

The '807 Patent states that the pin 152 is "slidably engaging through the bridge bore 192, pin bore 163, and the collar bore 188 for contacting the second pole 100." Doc. 1-1 at 24 [col. 7:35-37]. As shown in Figure 9 of the '802 Patent, Doc. 1-1 at 8, the pin bore 163 is within the pin plate 162 which is a part of the larger piece labeled the pin lever 150. All of which means that the pin 152 "slidably engaging within" the pin bore 163 is the equivalent of the pin 152 being within the pin plate 162 and pin lever 150 while it is sliding from the retracted position to the protruded position and vice versa.

But Defendants' proposed construction also misses the mark because it does not indicate what engages the pin so that it ultimately moves from the retracted to protruded position. The Court is not persuaded that the claim limitation requires the pin 152 to slide all the way through the pin lever 150 as Defendants argue. It actually slides through the pin bore 163 and is engaged by the pin key 170 which in turn is engaged by the pin lever 150. The claim elements that state that the pin lever's 150 movement directs the pin's 152 movement from a retracted to protruded position require it to move with the pin lever 150. *See* Doc. 46 at 24 (citing Doc. 1-1 at 22 [col. 4:14], 26 [11:34-43]).

The '802 Patent specification describes the operation of the pin 152 as follows:

> The collar 180 and the bridge member 190 encompasses the pin lever 150, pin 152, a pin spring 158, bore bushing 194, a pin key 170 and a pin washer 172. The pin lever 150 slidably engaging through the bridge bore 192, pin bore 163 and the collar bore 188 for

16

> contacting the second pole 100. The pin key 170 maintains the pin
> lever 150 between the collar 180 and the bridge member 190.

Doc. 1-1 at 24 [col 7:33-39].

And it states that the pin key 170 encircles the pin 152 and engages the pin lever 150 for retracting the pin 152 relative to the pin lever 150. *Id*. at col. 7:53-55. As a result, the pin key 170 keeps the pin 152 from sliding through the pin lever 15. The pin key 170 operates to make the pin 152 move *with*—as opposed to *through*—the pin lever 150 as the user presses and releases the pin lever 150.

Essentially the pin lever 150 is connected by the angled portion 166 with the pin plate 162 that contains the pin bore 163 in its center. So, to say that the pin 152 is within the pin bore 163 is the same as saying it is within the pin lever 150. Thus, once the user engages the pin lever 150 by pressing the handle plate 164 toward the pole 50, the pin 152, while within the pin lever 150, slides out of the collar bore 188 and through the bridge bore 192 causing the pin to protrude. When the user releases the pin lever 150 the pin 152 retracts.

Accordingly, the Court will independently construe the term: "a pin within the pin lever that when engaged slides between a retracted position and a protruded position."

## IV. CONCLUSION

The disputed claim terms are hereby **CONSTRUED** as follows:

1. **"said pin lever depressed for positioning said pin into said retracted position"** means "said pin lever pressed toward the pole for positioning said pin into said retracted position."

2. **"a first pin column and a second pin column positioned on opposing sides of the pin lever"** means "a first member and a second member positioned on opposing sides of the pin lever, each member raised with respect to the first pole."

17

3. **"a bridge member extending and coupled to said first pin column and said second pin column"** means "a component, separate and distinct from the first pin column and second pin column, that spans across and is connected to the first pin column and the second pin column."

4. **"said bridge member having a bridge bore for receiving said pin"** means "said bridge member having a hole for receiving said pin."

5. **"a pin slidably engaging within said pin lever between a retracted position and a protruded position"** means "a pin within the pin lever that when engaged slides between a retracted position and a protruded position."

**DONE AND ORDERED** in Tampa, Florida on December 28, 2018.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

18